Argued and submitted January 25, reassigned February 15, ballot title certified as modified May 3, reconsideration denied May 11, 1994

Terry L. WITT
and J. Edward Schroeder,
*Petitioners,*

*v.*

Theodore R. KULONGOSKI,
in his capacity as Attorney General
of the State of Oregon,
*Respondent.*

(SC S40905)

872 P2d 14

John DiLorenzo, Jr., of Hagen, Dye, Hirschy & DiLorenzo, Portland, argued the cause and filed the petition for petitioners.

Richard D. Wasserman, Assistant Attorney General, Salem, argued the cause and filed the response for respondent. With him on the response were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Fadeley, Unis, and Durham, Justices.

FADELEY, J.

Durham, J. dissented and filed an opinion in which Unis, J., joined.

## FADELEY, J.

This is a special statutory proceeding to review whether a ballot title certified for use with a proposed initiative measure substantially complies with the requirements of ORS 250.035 and 250.039. A review of the ballot title process will help in understanding the question before us and the role of the court in regard to that question.

The statutes prescribe that, when the Secretary of State receives a preliminary petition for a statewide initiative, the Secretary shall forward a copy to the Attorney General. ORS 250.065(1). That official then drafts a proposed ballot title for the initiative measure. ORS 250.065(3).

The draft ballot title is delivered to the Secretary of State, who, pursuant to ORS 250.067's mandate to provide "reasonable statewide notice," then publicizes and circulates it to a list of persons deemed to be interested, or potentially interested, in the subject of the measure. Those persons, and any others who learn of the draft ballot title, may object to, criticize, or comment upon it in writing to the Secretary of State, suggesting corrections or changes. Any such comments must be made within 10 business days after the Secretary receives the draft title from the Attorney General. ORS 250.067(1).

The Attorney General then considers all written criticisms and suggestions and, within five business days, decides whether to make changes in the draft title. ORS 250.067(2). Then, in the words of the statute, the Attorney General "shall certify to the Secretary of State either the draft ballot title or a revised ballot title" containing a caption, question, and summary related to that measure.[1] If, in either instance, no written comments to the draft ballot title are received, "the Attorney General shall certify the draft ballot title not later than the 15th business day after the Secretary

---

[1] ORAP 11.30(6) in part provides that, in case a petition for review of a ballot title is filed in this court:

"[T]he Attorney General shall include [to this court] the draft ballot title, the certified ballot title, the Attorney General's letter of transmittal to the Secretary of State and, if not overly lengthy, written comments received by the Secretary of State concerning the draft ballot title."

of State receives the draft title from the Attorney General."
*Id.*

If that certified ballot title is not challenged by a review proceeding, such as this one, filed within 10 days of the date that the Attorney General certifies that title, ORS 250.085(3), or if it is unsuccessfully challenged, the ballot title certified by the Attorney General is the one placed on the initiative petitions that are used to "obtain the signatures of the registered voters" required to place the measure on the ballot. If the ballot title is successfully challenged in this court, a modified title certified by this court is used on the petitions passed to obtain signatures. If those petitions garner sufficient elector signatures to place the measure on the ballot, the ballot title previously certified by the Attorney General, or by this court, also is printed in the official Voters' Pamphlet and on the general election ballots that the voters will cast to decide the measure's fate.[2]

Oregon statutes require that the three parts of a ballot title — caption, question, and measure summary — inform the voter of, respectively: (1) the subject of the proposed measure; (2) the chief purpose of the measure; and (3) the measure's major effect or effects.[3] ORS 250.035. Another statute also requires the Secretary of State to designate a test of readability consistent with other statutory requirements. ORS 250.039. Where an elector who commented on a title challenges it, this court is statutorily directed to "review the [ballot] title for substantial compliance with * * * ORS 250.035 and 250.039." ORS 250.085(5).

In order to determine subject, chief purpose, and major effect or effects, we turn to the text of the proposed

---

[2] In some counties, under the authority of ORS 254.175(1), only the caption and question are printed on the ballots used at the polling places.

[3] If the measure includes multiple subjects, purposes or effects, that should be recognized in the caption, question, and summary to the extent permitted by statutory limits of 10, 20, and 85 words for those portions of the title, respectively. *See Reed v. Roberts*, 304 Or 649, 655, 657, 748 P2d 542 (1988) ("the unambiguous language of the measure suggests a dual purpose," modifying summary to include two effects); *see also Kenagy v. Paulus*, 291 Or 765, 769, 634 P2d 1331 (1981) (implying that the explanation [now called summary] of a measure called for in ORS 250.035(1)(c) may appropriately cover more than one "chief purpose"). *See also* ORS 174.110(1) (singular may include plural). Of course, Article IV, section (1)(d) of the Oregon Constitution permits one subject only in an initiative measure but the ballot title review process must deal with the reality of what others have chosen to include in the measure. It is not a proceeding designed to enforce the one-subject-only provision.

initiative measure for which the challenged ballot title was prepared.

The text of the proposed measure in part provides:

"[3]    That, one year from enactment of this Act, the Board of Forestry shall, for each of the forest communities found in the State of Oregon, prescribe a list of lawful timber harvesting methods which:

"a.    do not involve clearcutting as defined by subsection (5) of this Section.

"b.    do not involve use of chemical herbicides or pesticides for regeneration of forest cover or protection of forest health.

"c.    maintain or maximize development of sufficient numbers of large, live trees, standing dead trees, and large, downed logs to provide habitat for species dependent upon the structural and compositional diversity such stands provide on at least 30% of each harvest unit.

"d.    limit created openings as defined by subsection (5) of this Section to 1/2 acre or less within the harvest unit.

"e.    maximize the potential for natural regeneration of native tree species.

"f.    encourage the use of highly skilled forest management staff in planning, implementation, and monitoring of forest operations.

"No timber harvesting in Oregon shall, upon adoption of final timber harvest methods by the Board, be inconsistent with such methods.

"[4]    That, until the Board prescribes lawful timber harvest practices pursuant to subsection (3) of this Section, no timberland owner or operator shall conduct timber harvest operations which result in lands being clearcut on any acre of forestland in the State." (Brackets in original.)

The measure employs a special definition for two important terms that are used in the measure, "clearcutting" and "created opening." The measure states:

"That, for the purposes of this Act,

"a.    clearcut shall be defined as:

"any harvest unit in western Oregon that leaves on any acre of the unit fewer than 50 well distributed trees that measure at least 11 inches diameter at

breast height or that leaves less than 40 square feet of basal area. In eastern Oregon, a clearcut means any harvest unit which leaves on any acre of the unit fewer than 25 well distributed trees that measure at least 10 inches diameter at breast height or that leaves less than 30 square feet of basal area. For the purposes of this subsection, no tree shall be counted unless the top one third of the bole of the tree supports a green, live crown. For the purposes of computing basal area, trees larger than 20 inches diameter at breast height shall be considered 20-inch trees.

"b.  created opening shall be defined as:

"any harvest unit where the canopy closure for trees in the most abundant diameter class falls below 35% for forestlands in western Oregon, and 25% for forests in eastern Oregon."

Five additional provisions of the proposed measure are also significant. They are as follows:

1.  "That, for purposes of this Act, all waters of the State where timber harvest occurs or could potentially occur shall be deemed navigable waters which, without the action proposed by this Act, cannot reasonably be expected to attain or maintain applicable water quality standards or the nonpoint source goals and requirements of the Federal Water Pollution Control Act [33 USC 1329]."

2.  "That, the Governor and State agencies shall promptly modify existing management programs to conform with the requirements of this Act, and shall promptly seek approval from the Administrator of the United States Environmental Protection Agency (EPA) for the modified nonpoint source water pollution program."

3.  "That, prior to approval by the EPA Administrator, nothing shall diminish the force and effect of the requirements of this Act."

4.  "That, no timber harvest operation in the State shall be commenced until filing of a notice and written plan. Notice and written plans shall document compliance with provisions of this Act, in addition to all other substantive requirements of law."

5.  "Any citizen of the United States may bring suit in State court to enforce any provision of this Act, and shall not be liable for attorney fees, damages, or any other financial

penalties unless grounds for the suit have been determined to be of a frivolous nature by the court of jurisdiction. Citizens who prevail in such suits shall be awarded attorney fees and any other damages or expenses incurred * * *."

Under the measure, any harvest must meet *all* of the following criteria and do so as to each timber harvest unit:

1.  Harvest must leave on each acre of a unit, "50 well distributed trees that measure at least 11 inches diameter at breast height or that leaves * * * 40 square feet of basal area." Section I(5)a.[4]

2.  "* * * .[N]o tree shall be counted [for purposes of the numbers left-standing or basal area requirement] unless the top one third of the bole of the tree supports a green, live crown." *Id.*

3.  No area where "canopy closure for trees *in the most abundant diameter class* falls below 35%" shall be permitted on any more than "1/2 acre or less within the harvest unit." Section I(5)b and I(3)d. (Emphasis added.)

4.  "[A]t least 30% of each harvest unit" shall "maintain," or develop and then maintain, "large, live trees, standing dead trees, and large, downed logs." Section I(3)c.

5.  If any "waters" of the State are present where "timber harvest occurs or could potentially occur," they "shall be deemed navigable waters" to which "the Federal Water Pollution Control Act" applies. Section I(9).

The Attorney General's proposed ballot title provides:

"BANS CLEARCUTTING, CHEMICAL HERBICIDES AND PESTICIDES IN FORESTS, WITH EXCEPTIONS

---

[4] The measure prevents counting basal area of larger trees in both "eastern" and "western" Oregon by mandating that all trees "larger than 20 inches in diameter breast height shall be considered 20-inch trees." Section I(5)(a). East of the Cascades only, trees that are 10 inches in diameter, 25 trees per acre, or 30-square feet of basal area are required to be left standing. For example, mature ponderosa of three-feet diameter would count as one tree with 20-inch basal area and 25 such trees per acre must be left standing.

"QUESTION: Shall statutes ban clearcutting, chemical herbicides, pesticides in forests with exceptions, add standards for lawful logging methods, allow citizen suits?

"SUMMARY: Amends Forest Practices Act. Bans clearcutting (defined), chemical herbicides, pesticides in forests. Covers private, state, federal forestlands. Exceptions for emergency fire suppression, approved statewide programs to end forest insect, disease epidemics. 40-acre clearcuts also allowed for approved stream restoration programs. Forestry Board must adopt lawful timber harvest methods for each forest community. Methods must meet listed tests. Requires filing of written plan before logging. State must send new water quality plan to federal EPA head for approval. Allows citizen suits to enforce measure. Other changes."

The legislature has limited the scope of the review of a ballot title that one who seeks to modify the title may obtain in this court. The requirement in ORS 250.085(2) that the petitioner must be an elector who commented, in writing, to the Secretary of State during development of the certified title has been mentioned already. In addition, ORS 250.085(5) and (6) provide:

"(5) The court shall review the title for substantial compliance with the requirements of ORS 250.035 and 250.039, and shall certify a title meeting this standard to the Secretary of State.

"(6) When reviewing a title prepared by the Attorney General, the court shall not consider arguments concerning the ballot title not presented in writing to the Secretary of State unless the court determines that the argument concerns language added to or removed from the draft title after expiration of the comment period provided in ORS 250.067."[5]

## DISCUSSION

Petitioners are entitled to argue two points to this court because they have complied with the strictures of ORS 250.085(6). They assert that the words "ban clearcutting" make the Caption, Question, and Summary "misleadingly

---

[5] There is an exception for arguments related to changes in wording first made by the Attorney General after expiration of the statutory period for making comments to the Secretary of State. However, where, as here, the draft title and the certified title contain no differences that relate to petitioners' arguments about defects in the certified title, that exception does not apply.

narrow and fail to describe the initiative's true subject, purpose and effect." They also argued that it is inappropriate for the title to omit mention of the fact that the act declares certain waters navigable. We shall consider each of those arguments in turn.

■　　The word "clearcutting" connotes an image of a brown hillside, denuded of all trees. The dictionaries support this understanding. Webster's Third New International Dictionary 420 (unabridged 1986), defines "clear" as:

"2a:　to remove from (as a space) all that occupies."

And "cut" means something that is "* * * cut off, severed," *id.* at 560. A specialized source used in the timber industry defines "clear cut," in a timber harvest setting, to mean:

"A logging method in which all of the trees in a given area are harvested, regardless of size." Random Lengths, Terms of The Trade 52 (3d ed 1993).

The measure uses the term with a very different and uncommon meaning, but the certified ballot title does not provide the voters notice of that crucial fact. It follows that voters likely will understand that the certified title's words "bans clearcutting" mean merely that the cutting and removal of *all* trees on a given harvest site is banned by the measure. That common understanding, based on the certified ballot title, would be in error. Much more than a ban on clearcutting, as commonly understood, is involved in the measure and its special definitions, and its additions to required timber harvest practices.

To summarize, the provisions of the measure previously quoted ban or prevent any timber harvest operation that fails to meet any one of the following conditions: 50 or more trees are left standing somewhat evenly distributed over each acre; if necessary additional trees sufficient to form a shade canopy covering at least 35 percent of the harvest area are left standing; no unshaded openings of over 1/2 acre are created in any harvest unit; at least 30 percent of the harvest unit maintains large live trees, standing dead trees and large downed logs or is dedicated to developing those three circumstances; and, finally, a new state plan for all waters in areas that do or potentially could produce timber has been submitted to and approved by the federal authorities administering

federal water pollution laws. Further, if there is a question about whether the state plan or any individual timber harvest operation complies with any of those criteria, "[a]ny citizen of the United States may bring suit * * * to enforce any provision of this Act, and shall not be liable for attorney fees, damages, or any other financial penalties."[6] It is true, of course, that the measure bans clearcutting as that practice is commonly understood. But part of the problem is that it does much more.

## CAPTION

All of the parts of the measure have a common purpose or subject, namely to restrict timber harvest. The measure replaces present regulations and methods by substituting new methods and regulations that will restrict significantly the harvest on any given acre of tree-growing land in Oregon. That broad change is overlooked by the proposed title's approach of listing only a few of the provisions in the measure.

The Attorney General acknowledges that many parts of the initiative are left out of the information intended to inform the voters, but says that simply cannot be helped. Because of the statutory word limits of 10 words for the Caption, 20 words for the Question, and 85 words for the Summary, there are not enough words to describe completely for the voters the subject, purpose, or major effects of the measure. But, while that argument addresses the omission of several distinct and disparate individual provisions, it does not explain why, in the case of this measure, the *subject* cannot be stated in 10 words or less, nor the *chief purpose* be phrased in the 20-word Question submitted to the voters for their "yes" or "no" vote, as the statute requires. The proposed title fails to advise of the "forest" of the measure because it focuses on describing but a few of the measure's "trees."

In order to meet the requirements of ORS 250.035-(1), we certify as the 10-word subject of the measure the following Caption:

---

[6] The proposed ballot title Caption and Question do not mention the provisions of the measure that relate to citizen lawsuits challenging timber harvest operations. The Summary only notes that citizen suits are allowed.

## "PROHIBITS MANY PRESENT TIMBER HARVEST PRACTICES, IMPOSES MORE RESTRICTIVE REGULATIONS."

The first clause of the above caption is based on the words of the proposed initiative that state that current methods of harvest, falling within the specialized definitions used in this measure, "shall no longer be a lawful forest practice on federal, state, and private forestlands in Oregon." Proposed measure, section I(1). The forest practices that shall no longer be lawful are many, going well beyond a ban on clearcutting or use of chemical herbicides and pesticides on forestlands. Examples are the requirements, quoted above, that 30 percent of an area be left in large, live trees, standing dead trees and large downed logs and the limitation on created openings to one-half acre. Another change is that the present regulatory protection of streams and waterways will no longer be the only protections. Instead, the proposed act declares "all waters of the State where timber harvest occurs or could potentially occur," navigable for the purposes of the Act. Section I(9). That section expressly imposes on all such waters the requirements imposed on navigable waters under the Federal Water Pollution Control Act. *Id*.

The measure also mandates that the state, *before engaging in any activity or permitting others to engage in any activity* related to the lands described, "shall promptly modify existing management programs to conform with the requirements of this Act, and shall promptly seek approval from the Administrator of the United States Environmental Protection Agency (EPA) for the modified * * * water pollution program." Section I(11). As petitioners point out, no mention of this important change, subjecting private timber land to federal regulation of harvest practices, is made in the certified Caption or Question. Our modified Caption's use of the phrase "imposes more restrictive regulations" at least alerts the voter to that characteristic of the measure.

## QUESTION

The Question, which should track and build upon the Caption,[7] is to "plainly phrase[] the chief purpose of the

---

[7] *Baker v. Keisling*, 312 Or 385, 392, 822 P2d 1162 (1991).

measure." ORS 250.035(1)(b). It is obvious from the foregoing discussion that the proposed Question in general fails plainly to phrase the chief purpose. The phrase "bans clearcutting," when clearcutting, as that word is commonly understood, is only a part of the timber harvest practices that are banned by the measure, again is a major reason that the Question fails to inform the voters of the measure's chief purpose. That certified Question suggests that only denuding the harvest site and use of toxic chemicals are prohibited by the measure. Removing the incomplete information, and focusing on the measure's chief purpose to impose various new restrictions on timber harvest, yields the following Question:

> "Shall new statutes prohibit many present timber harvest practices, impose more restrictive regulations, including federal regulation, allow citizen-suit enforcement?"

## SUMMARY

■  The Summary must provide a "concise and impartial statement * * * summarizing the measure and its major effect." ORS 250.035(1)(c). The proposed Summary would also erroneously lead the voters to think that clearcutting, as commonly understood, is the only major timber harvest practice affected by the measure. The 24 words in the fourth and fifth sentences of the certified Summary relate to exceptions. But creation of exceptions is not a major effect of the new restrictions. Reference to them may be shortened. The words "Bans Clearcutting (Defined)," also may be deleted because they are so incomplete (because so much more is banned) that they are not an impartial summary of the measure's major effect. We substitute the following Summary:

> "Prohibits many present timber harvest practices, chemical herbicides, pesticides in forest. Covers private, state, federal forestlands. Imposes new harvest regulations including federal regulation by classifying forestland waters as 'navigable.' Forestry Board must adopt new timber harvest methods and regulations to meet new requirements. Requires state to submit new forestland water quality plan to federal Environmental Protection Agency, seek approval before permitting logging. Authorizes citizen suits to enforce new harvest restrictions or other provisions of measure. Limited exceptions for fires, insect or disease epidemics, stream rehabilitation."

Reflecting those modifications, we certify the following ballot title for the proposed measure:

## PROHIBITS MANY PRESENT TIMBER HARVEST PRACTICES, IMPOSES MORE RESTRICTIVE REGULATIONS

QUESTION:   Shall new statutes prohibit many present timber harvest practices, impose more restrictive regulations, including federal regulation, allow citizen-suit enforcement?

SUMMARY:   Prohibits many present timber harvest practices, chemical herbicides, pesticides in forest. Covers private, state, federal forestlands. Imposes new harvest regulations including federal regulation by classifying forestland waters as "navigable." Forestry Board must adopt new timber harvest methods and regulations to meet new requirements. Requires state to submit new forestland water quality plan to federal Environmental Protection Agency, seek approval before permitting logging. Authorizes citizen suits to enforce new harvest restrictions or other provisions of measure. Limited exceptions for fires, insect or disease epidemics, stream rehabilitation.

Ballot title certified as modified. This decision shall become effective pursuant to ORAP 11.30(9).

**DURHAM, J.,** dissenting.

I believe that the ballot title certified to the Secretary of State by the Attorney General substantially complied with the requirements of ORS 250.035 and ORS 250.039. I therefore also would have certified that ballot title, ORS 250.085(5), and respectfully dissent from the majority's contrary conclusion.

Unis, J., joins in this dissenting opinion.