"Summary: Measure prohibits 'assault weapons' (defined), 'large capacity magazines' (defined), unless registered with State Police after background check. Criminal penalties.
" 'Assault weapons' definition includes:
"• Semiautomatic rifles with detachable magazine and certain additional features;
"• 'Semiautomatic, centerfire or rimfire rifles,' or semiautomatic pistol, capable of holding more than ten bullets with fixed magazine;
"• Semiautomatic centerfire rifles under thirty inches;
**164 "• Semiautomatic handguns with certain additional features;
"• Semiautomatic shotguns with certain additional features;
"• Shotguns with revolving cylinders.
" 'Large capacity magazines' defined as capable of holding over 10 rounds, excluding tubular magazines in .22 caliber or lever-action firearms.
"Covered items not registered must be sold/surrendered/ destroyed. State Police must maintain registry. Acquisition mostly prohibited after effective date, January 1, 2019. Measure may limit uses of covered items. Other provisions."
Petitioners are electors who timely submitted comments about the Attorney General's draft ballot title and who now are dissatisfied with all parts of the certified ballot title, including material that the Attorney General added after the comment period ended. See ORS 250.085(2) (describing who may challenge *365 certified ballot title); ORS 250.085(6) (Supreme Court may consider arguments about material added after comment period ended). We address their arguments below.[5]
II. ANALYSIS
A. Caption
We begin with the caption, which must, in 15 or fewer words, "reasonably identif[y] the subject matter" of the proposed measure. ORS 250.035(2)(a). Petitioners raise several challenges to the caption, and we agree that the caption must be modified in certain respects, as explained below.
**165 First, petitioners challenge the wording that refers to the registration requirements described in IP 43, sections 4(3)(e) and 4(4)(d)-that is, that the proposed measure would prohibit assault weapons and large capacity magazines "unless registered with state police." They argue that that quoted phrase is misleading because it implies that the registration exception would apply to future acquisitions, but, under IP 43, only inherited items are subject to such an exception after the effective date.
As an initial matter, we agree with the parties that the "subject matter" of IP 43, which the caption must identify, includes both the prohibition on assault weapons and large capacity magazines, and the accompanying registration exception. See Parrish v. Rosenblum , 362 Or. 96, 102, 403 P.3d 786 (2017) ("subject matter" refers to the "actual major effect" of a proposed measure or, "if the measure has more than one major effect, all such effects within [the] applicable word limit" (internal quotation marks omitted) ); Rasmussen v. Kroger , 350 Or. 281, 285, 253 P.3d 1031 (2011) (to identify the actual major effect, the Attorney General must consider the "changes that the proposed measure would enact in the context of existing law"). The central major effect of IP 43 is the criminal prohibition on the possession or transfer of the covered weapons and magazines. IP 43, § 4(1).[6] The registration exception is another effect that flows from that prohibition, as do many other of the measure's effects. Unlike other effects, however, the registration exception is subject to extensive additional requirements. IP 43, § 5. And the registration exception is the only means by which a current owner of a covered, operable weapon or magazine may retain ownership, with continuing possession in Oregon, after the effective date. Given those considerations, the registration **166 exception is a major effect that is appropriately mentioned in the caption. See Swanson v. Rosenblum , 362 Or. 143, 146-47, 404 P.3d 949 (2017) (concluding that, to accurately convey the scope of a term limits measure, the caption must mention both the new limits and how they would be calculated; distinguishing that scenario from a ballot title that appropriately mentions the details of a complex measure in the result statements or the summary, instead of in the caption).
We agree with petitioners, however, that the caption inaccurately describes the registration exception. By stating that assault weapons and large capacity magazines *366 are prohibited "unless registered with state police," the caption implies that the exception generally permits registered ownership after IP 43 goes into effect. But, unless a covered weapon or magazine is inherited later, the exception applies only at the outset-that is, to any person who possesses a prohibited weapon or magazine prior to the proposed measure becoming effective (who then has 120 days to either register the weapon or magazine, or take a different required, alternative step). IP 43, § 4(3). (For inherited items, the registration exception applies for 120 days after the owner acquires title, id. at § 4(4)(d).) No other person is permitted to register a covered item, at any time. The caption must be modified accordingly.
Petitioners raise another challenge to the caption that merits discussion. They argue that the terms "assault weapons" and "large capacity magazines" do not reasonably identify the subject matter of IP 43, and, instead, are impermissibly deceptive, confusing, and underinclusive. They assert that voters would share no common understanding of either term, except perhaps in reference to military-style weapons and their magazines (e.g. , automatic weapons, such as machine guns; or military-style semiautomatic weapons, such as AR-15s or AK-47s). In petitioners' view, however, IP 43 would prohibit possession of a "wide array of commonly owned" semiautomatic weapons and their magazines. For example, one definition of "assault weapon" in IP 43 is a semiautomatic rifle with the capacity to accept a detachable magazine and having at least one of several other identified features, IP 43, § 3(1)(a)(A), but petitioners contend that many of the listed features-as well as detached magazine **167 capacity-are standard.[7] They offer many additional examples, citing various IP 43 definitions involving rifles, shotguns, and pistols, to contend that the proposed measure is exceptionally broad in scope.[8] The same is true, petitioners add, of magazines falling within the definition of "large capacity magazine"-that is, "any ammunition feeding device with the capacity to accept more than 10 rounds" or a conversion kit, with exceptions. IP 43, § 3(6). They emphasize that, (1) contrary to its own definition in IP 43, "large" suggests a number far exceeding 10; (2) most modern semiautomatic pistols are equipped with standard-issue magazines capable of holding 14-18 rounds; and (3) magazines holding more than 10 rounds also are standard for most handguns and rifles. It follows, they conclude, that "virtually all," "almost all," or "most" semiautomatic rifles, shotguns, and pistols, and their magazines, would be subject to IP 43, but voters likely would not recognize that many "commonly used" items would be so "[en]snared."
The Attorney General acknowledges the lack of a shared understanding of the terms "assault weapons" and "large capacity magazines," but she contends that it is impossible to craft more accurate definitions-without omission or oversimplification-in the 15 words allotted for the caption.[9]
**168 In the Attorney General's view, the use of quotation *367 marks surrounding those terms, coupled with the elaborating signals, "(defined)," sufficiently conveys that the measure itself defines the terms "assault weapon" and "large capacity magazine." See Chamberlain v. Myers , 344 Or. 612, 616, 188 P.3d 240 (2008) (court has required the Attorney General to place quotation marks around a term taken from a proposed measure, when the meaning is ambiguous); Carley/Towers v. Myers , 340 Or. 222, 232-33, 132 P.3d 651 (2006) (requiring, at the least, that a signal such as "(defined)" accompany an unfamiliar, quoted abbreviation, when the abbreviation would lead to unnecessary confusion). Petitioners, in turn, disagree that the quotation marks and accompanying "(defined)" signals render the caption substantially compliant with ORS 250.035(2)(a).[10] For the reasons explained below, we agree with petitioners.
This court's decision in Tauman v. Myers , 343 Or. 299, 170 P.3d 556 (2007), involved similar-albeit not identical-circumstances as those involved here. The proposed measure in that case had set out a constitutional amendment that would have limited the recovery of noneconomic and punitive damages from a "charity," which the measure broadly defined as a nonprofit organization exempt from federal income taxes due to an extensive array of identified activities. The Attorney General included the quoted term "charity" in the caption, followed by "(defined)." Id. at 301, 170 P.3d 556. The petitioner challenged that aspect of the caption, arguing that it would leave most readers with "a false impression about the proposed measure's scope"-namely, that the measure was limited to organizations engaged in providing free assistance to the poor, the suffering, or the distressed-as opposed to more broadly including other nonprofit organizations. Id. at 302, 170 P.3d 556. This court agreed that the measure defined the term "charity" "more broadly than the term commonly is understood," such that the caption, in turn, "ha[d] the potential to leave petition signers and voters with a false impression of the proposed measure's subject matter." Id. at 303, 170 P.3d 556.
**169 The court rejected the Attorney General's argument that the accompanying signal, "(defined)," rendered the caption satisfactory under the substantial compliance standard:
"Although this court has approved the use of specially defined terms in quotation marks, followed by the word 'defined' in parentheses, to signal that the proposed measure specially defines a term and uses it in that specially defined sense, this court has never held that the use of such signals is always sufficient to ensure compliance with statutory standards. Rather, the court has approved those signals when, for example, the meaning of the disputed term was ambiguous and the proposed measure defined the term in a manner generally consistent with an accepted meaning of the term. Here, by contrast, the proposed measure gives the term 'charity' a unique definition that is significantly broader than its common definition. Under those circumstances, the signals described in Carley/Towers do little to cure the confusion caused by the caption's use of the term."
343 Or. at 303-04, 170 P.3d 556 (internal quotation marks and citations omitted). In other cases, this court similarly has determined that using a quoted term from the measure may not be permissible, when the measure defines the term in an "uncommon, if not unique" way. See, e.g. , Sager v. Myers , 328 Or. 528, 531-33, 982 P.2d 1104 (1999) (so stating, in context of modifying a ballot title caption using the term "job performance" from proposed initiative about teacher pay, defined as the degree to which the students' appropriate knowledge increased while under a teacher's instruction); Witt v. Kulongoski , 319 Or. 7, 14-17, 872 P.2d 14 (1994) (court modified caption using the term "clearcutting," when the proposed measure gave that term "a very different and uncommon meaning," but the caption did not so notify voters); see also Kain/Waller v. Myers , 337 Or. 36, 40, 93 P.3d 62 (2004) (caption must use terms that identify the subject matter and neither *368 understate nor overstate the scope of the legal changes that the measure would enact).
As described above, petitioners argue that, if a commonly understood meaning of "assault weapons" exists, it refers to military-style weapons, not semiautomatic weapons with the types of features described in IP 43 (many of which, they contend, are "standard"). We cannot say whether that **170 is so, but we do agree (as does the Attorney General) that different voters reasonably could draw different meanings from the term "assault weapons"-some might think that it refers to only military-style weapons; some might think that it refers to the types of weapons that are described in IP 43; and some might think that it refers to an even more broad group of weapons. Similarly, different voters reasonably could draw different meanings from the term "large capacity magazines"-some thinking that it referred to magazines holding 10 rounds or fewer, but others thinking that it referred to magazines holding far more than 10 rounds.
This case is not necessarily the same as Tauman , in which the proposed measure defined a term more broadly than its commonly understood meaning. But, in light of the particular definitions of "assault weapon" and "large capacity magazine" set out in IP 43, we agree with petitioners that the use of those terms in the caption-even if surrounded by quotation marks and accompanied by "(defined)"-would confuse or mislead voters about the measure's subject matter. See Greene v. Kulongoski , 322 Or. 169, 174-75, 903 P.2d 366 (1995) (caption must accurately describe subject matter "in terms that will not confuse or mislead potential petition signers and voters"). IP 43 provides broad definitions for both terms that differ from what at least some voters reasonably would think was meant by the terms "assault weapons" and "large capacity magazines," and, as explained, other voters reasonably may draw other, contrasting meanings from each term. See Swanson , 362 Or. at 146-47, 404 P.3d 949 (requiring modification of a caption when its wording could cause voters to reasonably misunderstand how the proposed measure's operative provision would apply). It follows that that aspect of the caption does not substantially comply with ORS 250.035 (2)(a).
We understand the Attorney General's expressed difficulty-given the 15-word limit for the caption-in crafting a more accurate description of the defined terms "assault weapon" and "large capacity magazine." And we disagree with petitioners' argument that the caption must state that IP 43 would ban "virtually all," "almost all," or "most" semiautomatic weapons and their magazines-those are factual contentions that are beyond the scope of the questions before **171 us in these consolidated challenges to the certified ballot title. But, given the particular definitions set out in IP 43, section 3, we conclude that the caption could accurately state that the proposed measure would criminalize the possession and transfer of many semiautomatic weapons, as well as magazines holding over 10 rounds. We refer the caption to the Attorney General for modification.
B. "Yes" and "No" Result Statements
We turn to the "yes" and "no" result statements, which must be "simple and understandable" statements not exceeding 25 words that "describe[ ] the result" if the proposed measure is approved or rejected. ORS 250.035(2)(b)-(c). Petitioners first challenge the "yes" result statement for the same reasons identified above, that is, that it inaccurately describes the registration exception, IP 43, §§ 4(3)(e), 4(4)(d), and also inaccurately conveys the scope of the measure in light of the particular definitions of "assault weapon" and "large capacity magazine," id. at §§ 3(1), (6). We agree, for the reasons explained above, that the Attorney General must modify the "yes" result statement in those respects. See, e.g. , Lavey v. Kroger , 350 Or. at 559, 564, 258 P.3d 1194 (2011) (to substantially comply with the statutory requirements for a "yes" result statement, an "accurate description of the change that will be caused by the measure is key" (emphasis in original) ).
Petitioners raise additional contentions about the "yes" result statement, arguing that it should identify several results that would occur if the voters approve IP 43. We agree with one of those contentions: The "yes" result statement should explain that a *369 current owner must either register an assault weapon or a large capacity magazine, or must surrender, transfer, or destroy it. See IP 43, § 4(3) (describing those actions). That result would be of great importance to voters-certainly to current owners of weapons and magazines falling within the scope of IP 43-and therefore must be mentioned in the "yes" result statement. See Berman v. Kroger , 347 Or. 509, 513, 225 P.3d 32 (2009) (explaining that the Attorney General has more available words in the "yes" result statement than in the caption, which permits additional description of the results if the measure is approved); **172 Novick/Crew v. Myers , 337 Or. 568, 574, 100 P.3d 1064 (2004) (statutory obligation to describe results means "notify[ing] petition signers and voters of the result or results of enactment that would have the greatest importance to the people of Oregon").
We do not disagree with petitioners that additional results will flow from approval of IP 43 that would be important to many voters. But, within the 25-word limit of the "yes" result statement, ORS 250.035(2)(b) does not require the Attorney General to modify that statement to specifically describe any additional result.[11]
As to the "no" result statement, we agree with one of petitioners' contentions. That statement describes current law, among other things, as "barring purchases by certain individuals[.]" (Emphasis added.) Current law, however, more broadly bans "possession" by certain individuals. See ORS 166.250 - 166.255 ; ORS 166.270 (prohibiting possession by felons; persons found guilty of felonies except for insanity; certain committed persons; persons with mental illness and others subject to firearms prohibitions by court order; minors (with exceptions); and adults who were found to be within juvenile court jurisdiction on certain delinquency allegations within prior four years). The "no" result statement therefore must be modified to more accurately describe current bans on "possession," rather than "purchases."[12]
C. Summary
Next, petitioners challenge the summary, which must contain "a concise and impartial statement" not exceeding 125 words that "summariz[es] the * * * measure and its **173 major effect." ORS 250.035(2)(d). They argue that the summary carries forward the same problematic content from the caption and vote result statements, and that other important aspects of IP 43 are either omitted or are described using only vague descriptions without any context. We agree with several of petitioners' arguments, as discussed below.
First, as with our earlier evaluation of the caption and "yes" result statement, the summary inaccurately conveys that the registration exception in IP 43 is a general exception that would continue after the effective date of the proposed measure, when it in fact is limited to only existing weapons and magazines owned when the measure goes into effect, unless inherited at a later date. Inaccurate wording appears in two parts of the summary: (1) at the outset, in the phrase, "unless registered with State Police after background check"; and, (2) near the end, in the phrase, "[c]overed items not registered must be sold/surrendered/ destroyed." We do not think that the later statement in the summary, "[a]cquisition mostly prohibited after effective date," corrects the preceding inaccuracies-a voter easily could understand the three quoted parts of the summary, read *370 together, to mean that a later-acquired weapon or magazine would be permitted, if registered. In operation, however, ownership would be limited to existing covered items, once registered after the effective date (except for those acquired by inheritance or pursuant to other user exceptions). The summary must be modified to accurately describe the registration exception.
Second and relatedly, to substantially comply with ORS 250.035(2)(d), the summary must state that a current owner must take one of the required, alternative actions within 120 days of the effective date of IP 43 (that is, either register a covered assault weapon or a large capacity magazine, or sell, surrender, or destroy it). IP 43, §§ 4(3), 4(4). See McCann/Harmon v. Rosenblum , 354 Or. 701, 708, 320 P.3d 548 (2014) (purpose of summary is "to give voters enough information to understand what will happen if the initiative is adopted").
Third, petitioners argue that the summary does not sufficiently convey that, under IP 43, the unlawful possession **174 or transfer of an assault weapon or large capacity magazine would be a Class B felony, imposing significant criminal penalties. IP 43, § 4(6). The Attorney General responds that the summary's reference to "[c]riminal penalties" is sufficient. We agree with petitioners that the creation of a new felony-which carries far more significant penalties than a misdemeanor-must be mentioned in the summary. Compare ORS 161.605(2) (maximum term of indeterminate sentence for Class B felony is 10 years); ORS 161.625(1)(c) (maximum fine for Class B felony is $250,000); with ORS 161.615 (maximum sentences for misdemeanors range between 30 and 364 days); ORS 161.635(1) (maximum fines for misdemeanors range between $1,250 and $6,250). The summary must be modified in that respect.[13]
Fourth, petitioners challenge the statement in the summary that IP 43 "may limit uses of covered items." (Emphasis added.) They argue that the registration conditions set out in section 5(4)(b) amount, in effect, to a ban on the use of registered assault weapons and large capacity magazines on public lands, even for the purpose of hunting, target-shooting, or self-defense. The Attorney General responds that the summary accurately conveys the proposed measure's restrictions on use; in her view, "the measure specifies locations where registered firearms may be taken or held, which may limit the lawful uses of those firearms." For the reason set out below, we agree with petitioners that the summary does not accurately state that IP 43 would impose limits on the use of registered items.
As explained earlier, IP 43 provides as follows. First, in section 4(1), the proposed measure creates the new crime of unlawful possession or transfer of an assault weapon or large capacity magazine, "except as provided" in subsections (2), (3), and (4) of section 4. Then, in subsections (3)(e) and (4)(d) of section 4, the measure provides that any person who owns a covered weapon or magazine prior to the effective date may seek to register it within 120 days, and any person who inherits such an item may seek to register it within **175 120 days after acquiring title. Both those subsections cross-reference section 5, which in turn sets out extensive requirements for registration. Most notably for our purposes here, a person seeking to register a weapon or magazine must submit satisfactory evidence that he or she possesses the item only in certain locations, or in certain circumstances, or both (e.g. , on his or her own property, or on another's property with the owner's express permission; on the premises of a licensed dealer or gunsmith for lawful repair purposes; at a public or private shooting range or gallery; at firearms competitions, exhibitions, or displays with additional restrictions; or while transporting to an authorized location). IP 43, § 5(4)(b). Stated another way, after the effective date, registration is the only means by which certain owners may legally possess a covered weapon or magazine, and, as a condition to registration, the measure imposes location and use restrictions on qualifying owners. *371 Returning to the summary, we conclude that the statement that IP 43 "may limit uses of covered items" is inaccurate. That statement conveys that the proposed measure may-or may not-limit the use of registered assault weapons or magazines. As explained, however, section 5 imposes several such restrictions as a condition to registration, which in turn is the only means of lawfully possessing a covered item after the effective date. The summary must be modified to state that the measure would limit the use of covered items. See Conroy v. Rosenblum , 359 Or. 601, 607, 380 P.3d 299 (2016) (explaining how use of "might" in a summary to describe a certain effect was inaccurate and required modification); Fred Meyer, Inc. v. Roberts , 308 Or. 169, 175, 777 P.2d 406 (1989) (purpose of summary is to "help voters understand what will happen if the measure is approved" and "the breadth of its impact").[14]
Finally, we observe that the Attorney General's summary uses more words than necessary to describe the terms "assault weapon" and "large capacity magazine" (for example, repeated use of the word "[s]emiautomatic"), at the **176 expense of providing more useful descriptions of other parts of IP 43. In modifying the summary, the Attorney General should consider using fewer words to describe the prohibited weapons and magazines, so that she can more accurately describe the aspects of the proposed measure that we have identified.
III. CONCLUSION
We refer the ballot title for IP 43 to the Attorney General for modification of the caption, the "yes" and "no" result statements, and the summary, as described in this opinion.
The ballot title is referred for modification.
**177 APPENDIX
BE IT ENACTED BY THE PEOPLE OF THE STATE OF OREGON:
SECTION 1. Sections 2 to 5 of this 2018 Act are added to and made a part of ORS 166.250 to 166.470.
SECTION 2. The people of the State of Oregon find and declare that a reduction in the availability of assault weapons and large capacity ammunition magazines will promote the public health and safety of the residents of this state.
SECTION 3. As used in sections 2 to 6 of this 2018 Act: (1)(a) "Assault weapon" means any:
(A) Semiautomatic rifle that has the capacity to accept a detachable magazine and has at least one of the following:
(i) Any grip of the weapon, including a pistol grip, a thumbhole stock or any other stock, the use of which would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing;
(ii) Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;
(iii) A folding or telescoping stock;
(iv) A shroud attached to the barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel;
(v) A forward pistol grip;
(vi) A flash suppressor, muzzle brake, muzzle compensator, or threaded barrel designed to accommodate a flash suppressor, muzzle brake, or muzzle compensator;
(vii) A bayonet mount; or
(viii) A grenade launcher or flare launcher;
**178 (B) Semiautomatic pistol, or any semiautomatic, centerfire or rimfire rifle with a fixed magazine, that has the capacity to accept more than 10 rounds of ammunition;
*372 (C) Semiautomatic, centerfire rifle that has an overall length of less than thirty inches;
(D) Semiautomatic pistol that has the capacity to accept a detachable magazine and has at least one of the following:
(i) Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;
(ii) A folding, telescoping or thumbhole stock;
(iii) A shroud attached to the barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel;
(iv) The capacity to accept a detachable magazine at any location outside of the pistol grip; or
(v) A threaded barrel capable of accepting a flash suppressor or forward pistol grip;
(E) Semiautomatic shotgun that has both of the following:
(i) Any grip of the weapon, including a pistol grip, a thumbhole stock or any other stock, the use of which would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing; and
(ii) A folding or telescoping stock;
(F) Semiautomatic shotgun that has at least one of the following:
(i) A fixed magazine capacity in excess of ten rounds; or
(ii) An ability to accept a detachable magazine;
(G) Shotgun with a revolving cylinder; and **179 (H) Conversion kit, part or combination of parts from which an assault weapon can be assembled if those parts are in the possession or under control of the same person.
(b) "Assault weapon" does not include any firearm that has been made permanently inoperable.
(2) "Criminal background check" has the meaning given that term in ORS 166.432.
(3) "Department" means Department of State Police.
(4) "Detachable magazine" means an ammunition feeding device that can be loaded or unloaded while detached from a firearm and readily inserted into a firearm.
(5) "Fixed magazine" means an ammunition feeding device contained in or permanently attached to a firearm in such a manner that the device cannot be removed without disassembly of the firearm action.
(6) "Large capacity magazine" means any ammunition feeding device with the capacity to accept more than 10 rounds or any conversion kit or combination of parts from which such a device can be assembled, but does not include any of the following:
(a) A feeding device that has been permanently altered so that it cannot accommodate more than 10 rounds;
(b) A .22 caliber tube ammunition feeding device; or
(c) A tubular magazine that is contained in a lever-action firearm.
SECTION 4. (1) Notwithstanding ORS 166.250 to 166.470, and except as provided in subsections (2) to (4) of this Section 4, a person commits the crime of unlawful possession or transfer of an assault weapon or large capacity magazine if the person manufactures, imports, possesses, purchases, sells or transfers any assault weapon or large capacity magazine.
(2) Subsection (1) of this Section 4 does not apply to:
**180 (a) Any government officer, agent or employee, member of the Armed Forces of the United States or peace officer as that term is defined in ORS 133.005 if that person is otherwise authorized to acquire or possess an assault weapon or large capacity magazine and does so while acting within the scope of that person's duties;
*373 (b) The manufacture of an assault weapon or large capacity magazine by a firearms manufacturer for the purpose of sale to any branch of the Armed Forces of the United States or to a law enforcement agency in this state for use by that agency or its employees, provided the manufacturer is properly licensed under federal, state and local laws; or
(c) The sale or transfer of an assault weapon or large capacity magazine by a firearms dealer licensed under 18 U.S.C. 923 to any branch of the Armed Forces of the United States or to a law enforcement agency in this state for use by that agency or its employees for law enforcement purposes.
(3) Any person who, prior to the effective date of this law, was legally in possession of an assault weapon or large capacity magazine shall, within 120 days after the effective date of this 2018 Act, without being subject to prosecution:
(a) Remove the assault weapon or large capacity magazine from the state;
(b) Sell the assault weapon or large capacity magazine to a firearms dealer licensed under 18 U.S.C. 923 for lawful sale or transfer under subsection (2) of this section;
(c) Surrender the assault weapon or large capacity magazine to a law enforcement agency for destruction;
(d) Render the assault weapon permanently inoperable; or
(e) If eligible, register the assault weapon or large capacity magazine with the Department as provided in Section 5 of this 2018 Act.
(4) Any person who acquires an assault weapon or large capacity magazine, for which registration was previously properly obtained under Section 5 of this Act, by inheritance, bequest or succession, or by virtue of the person's **181 role as executor or other legal representative of an estate or trust, shall, within 120 days after acquiring title, without being subject to prosecution under this section:
(a) Surrender the assault weapon or large capacity magazine to a law enforcement agency for destruction;
(b) Transfer the assault weapon or large capacity magazine to a firearms dealer licensed under 18 U.S.C. 923 for lawful sale or transfer under subsection (2)(c) of this section;
(c) Render the assault weapon permanently inoperable; or
(d) If eligible, register the assault weapon or large capacity magazine with the Department and meet all of the requirements under Section 5 of this 2018 Act, except the time for registering shall run from the date of acquiring title.
(5) Any person who moves into the state and immediately prior to moving is in lawful possession of an assault weapon or large capacity magazine, shall, unless exempt under Section 4(2)-(4) of this Act, within 120 days:
(a) Surrender the assault weapon or large capacity magazine to a law enforcement agency for destruction;
(b) Transfer the assault weapon or large capacity magazine to a firearms dealer licensed under 18 U.S.C. 923 for lawful sale or transfer under subsection (2)(c) of this section; or
(c) Render the assault weapon permanently inoperable.
(6) Unlawful possession or transfer of an assault weapon or large capacity magazine is a Class B felony.
SECTION 5. (1) Any person seeking to register an assault weapon or large capacity magazine with the Department shall do so as provided in this section within 120 days after the effective date of this 2018 Act.
(2) In order to register an assault weapon under this section, the owner of the assault weapon must:
**182 (a) Submit to the Department, on a form approved by the Department, the owner's name and address and the identification number of each assault weapon owned by the owner:
(b) Be the lawful owner of the assault weapon prior to the effective date of this 2018 Act; and *374 (c) Allow the Department to conduct a criminal background check of the person to confirm that the person is not a prohibited possessor under ORS 166.250.
(3) In order to register a large capacity magazine under this section, a person must:
(a) Submit to the Department, on a form approved by the Department, the owner's name and address and information sufficient to identify any large magazine owned or possessed by the owner;
(b) Be the lawful owner of the large capacity magazine prior to the effective date of this 2018 Act; and
(c) Allow the Department to conduct a criminal background check of the person to confirm that the person is not a prohibited possessor under ORS 166.250.
(4) A person seeking to register an assault weapon or large capacity magazine must submit evidence satisfactory to the Department to establish that:
(a) The owner has securely stored the assault weapon or large capacity magazine pursuant to existing law and, in addition, as provided in any rules and regulations adopted by the Department specifically relating to assault weapons and large capacity magazines;
(b) The owner possesses any lawful assault weapon or large capacity magazine only:
(A) On property owned or immediately controlled by the registered owner;
(B) On property owned by another with the owner's express permission in a manner consistent with subsection (4)(a) in this section;
**183 (C) On the premises of a firearms dealer or gunsmith licensed under 18 U.S.C. 923 for the purpose of lawful repair;
(D) While engaged in the legal use of the assault weapon or large capacity magazine, at a public or private shooting range, shooting gallery or other area designed and built for the purpose of target shooting;
(E) At a firearms competition or exhibition, display or educational project about firearms sponsored, conducted by approved or under the auspices of a law enforcement agency or a national or state-recognized entity that fosters proficiency in firearms use or promotes firearms education; or
(F) While transporting the weapon in a vehicle as permitted in ORS 166.250 to one of the locations authorized under this statute.
(5) A registered owner of an assault weapon or large capacity magazine may not sell or transfer the assault weapon or large capacity magazine except to a firearms dealer or to a gunsmith licensed under 18 U.S.C. 923 for repair, lawful sale or transfer or for the purpose of disposal as provided in SECTION 3 of this 2018 Act.
(6) A registered owner of an assault weapon or large capacity magazine may not purchase additional assault weapons or large capacity magazines.
(7) A registered owner of a registered assault weapon or large capacity magazine must report the loss or theft of such weapon or magazine to the appropriate law enforcement agency within 48 hours of the discovery of the loss or theft.
SECTION 6. (1) Upon receipt of a request from a person seeking to register an assault weapon or large capacity magazine, the Department shall determine from criminal records and other available information whether the potential registrant is disqualified under ORS 166.250 from possessing the assault weapon or large capacity magazine.
(2) The Department may adopt a fee schedule for criminal background checks as provided in ORS 166.414.
**184 (3) The Department shall establish a means of obtaining the information that must be provided by owners of assault weapons and large capacity magazines who qualify for registration under Section 5 of this 2018 Act, which information must include the information required by Section 5 of this Act, and any other information determined necessary by the Department to carry out the purposes of this 2018 Act.
(4) The Department shall maintain a registry of the information obtained by it pursuant to Sections 5 and 6(3) of this 2018 Act, *375 and shall adopt rules concerning the administration of the registry, including but not limited to renewal and revocation procedures and storage requirements for assault weapons and large capacity magazines.
(5) The record of the information collected for registration under this section is exempt from disclosure under the public records law in the same manner such information is maintained under ORS 166.436.
SECTION 7. If any provision of this Act or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of this Act which can be given effect without the invalid provision or application, and to this end the provisions of this Act are severable. The people hereby declare that they would have adopted this Chapter, notwithstanding the unconstitutionality, invalidity and ineffectiveness of any one of its articles, sections, subsections, sentences or clauses.
SECTION 8. This Act shall take effect on January 1, 2019.

For ease of reference, we use the plural term "petitioners" to refer to arguments made by one petitioner, by a group of petitioners, or by all of them.
We do not address in this opinion any argument that we have concluded is without merit. See generally Hamilton v. Myers , 326 Or. 44, 51, 943 P.2d 214 (1997) (petitioners must show that certified ballot title does not substantially comply with statutory requirements, not that alternative wording would be "better"). We also do not address any argument by a petitioner that he or she could have raised to the Secretary of State, but did not, concerning material originally contained in the draft ballot title that also is included in the certified ballot title. ORS 250.085(6).

The Chief Petitioners of IP 43, appearing as amicus curiae , argue that the "subject matter" of IP 43 is not "criminalizing possession"; rather, the proposed measure "seeks to regulate these firearms and prevent their proliferation." Although we have no reason to disagree with Chief Petitioners about their underlying objective in advocating for IP 43, the text and structure of the measure itself shows that the central major effect is the new criminal prohibition. The initial operative section of the measure, section 4(1), creates a new crime (unlawful possession or transfer of an assault weapon or large capacity magazine); then, one of several exceptions is the registration of existing or inherited covered items. The regulatory aspects of IP 43, on which Chief Petitioners rely in arguing about the subject matter, are part of that registration exception. IP 43, § 5.

For a semiautomatic rifle with a detachable magazine, the listed features include (among other things) certain types of grips; a folding or telescope stock; a flash suppressor, muzzle brake, or muzzle compensator; and a shroud either attached to the barrel or partially or completely encircling the barrel, allowing the bearer to hold the weapon with the nontrigger hand without being burned (but excluding a slide that encloses the barrel). IP 43, § 3(1)(a)(A). A prohibited type of grip is one that allows a person to grip the weapon when firing, with a finger on the trigger and any other finger on the same hand located directly below any part of the action. Id. at § 3(1)(a)(A)(i).

As another example, petitioners characterize the definition involving semiautomatic shotguns as including many "standard" features, such as a pistol grip, a thumbhole stock, a folding or telescoping stock, a fixed magazine in excess of 10 rounds, and the ability to accept a detachable magazine. IP 43, § 3(1)(a)(E)-(F)

The Chief Petitioners of IP 43 argue that, while "assault weapon" does not have a universally accepted definition, "it generally refers to semi-automatic firearms that accept large capacity magazines that allow rapid fire." Similarly, under the collective definitions set out in IP 43, section 3(1)(a), they argue that "[t]he key characteristic that renders a firearm an 'assault weapon'-i.e. , a weapon with features that are neither suitable nor necessary for civilian use-is the ability to fire a large number of rounds rapidly while maintaining control of the firearm." They do not disagree that many firearms currently on the market may carry the types of features identified in the proposed measure.

In urging that we reject petitioners' challenges, the Chief Petitioners of IP 43 argue that "it is exactly because 'assault weapons' and 'large capacity magazines' do not have a standard definition that it is essential for the ballot title to tell voters that the terms are specifically define[d]." (Emphasis Chief Petitioners'.)

To obtain more available words within the 25-word limit, when modifying the "yes" result statement, the Attorney General need not include the current phrase, "State Police must maintain registry." Unlike the requirements that apply to current owners set out in IP 43, section 4(3), that result is not so significant that it must be mentioned in the "yes" result statement. And, in any event, the fact that a registry will be maintained is inherent in the registration exception, which already is mentioned in the "yes" result statement.

We disagree with petitioners that the "no" result statement must more specifically identify the individuals who currently are not permitted to possess firearms-including convicted felons, some civilly committed persons, persons subject to firearms prohibitions by court order, and others. In that regard, the more general reference in the "no" result statement to "certain individuals" substantially complies with ORS 250.035(2)(c).

We do not mean to suggest that, to substantially comply with ORS 250.035(2)(d), the summary must state that IP 43 creates a "Class B" felony or that it must include information about maximum terms and fines that would apply to a Class B felony. We reject petitioners' arguments to the contrary.

We disagree with petitioners that, to substantially comply with ORS 250.035(2)(d), the summary must specifically identify particular limits on use; rather, it is sufficient to state that IP 43 would limit use.